**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **NO. 5:26-CR-00115-REW-MAS** |
| | ) | |
| **KAYLIEB M. THOMPSON,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER**

Defendant Kaylieb M. Thompson presents the challenging picture of a grief-stricken loved one and crime victim, who has become an alleged perpetrator in his own right. After the death of his fiancée, Thompson allegedly engaged in increasingly threatening conduct over the past year that has resulted in the instant indictment for obstruction of justice in violation of 18 U.S.C. § 1503. At the initial appearance, the United States moved for detention pursuant 18 U.S.C. § 3142(f)(2)(B). Because the Court finds Thompson poses a risk of physical danger to others and a risk of obstructing justice that cannot be mitigated with conditions, the Bail Reform Act mandates detention.

## I. LEGAL STANDARD

The Court afforded both sides all procedural rights outlined in the Bail Reform Act ("BRA"). The United States bears the burden to prove a defendant should be

detained pretrial. Detention premised on nonappearance requires preponderant evidence. *See, e.g.*, *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *United States v. Curry*, No. 6:06-CR-82-DCR, 2006 WL 2037406, at *6 (E.D. Ky. Jul. 18, 2006). Danger-based detention, however, demands clear and convincing evidence that no combination of conditions will reasonably ensure community safety. 18 U.S.C. § 3142(f). The analyses are distinct. Conditions that sufficiently target nonappearance risk may not adequately address danger potential. *See United States v. Mercedes*, 254 F.3d 433, 436-37 (2nd Cir. 2001). Further, condition effectiveness inherently hinges on a defendant's predicted good faith compliance. *See United States v. Tortora*, 922 F.2d 880, 887 (1st Cir. 1990) (characterizing predicted compliance as critical release component); *United States v. Hir*, 517 F.3d 1081, 1092 (9th Cir. 2008) (noting the "critical flaw" in a set of proposed release conditions: "In order to be effective, they depend on [the defendant's] good faith compliance."); *id.* at 1093 n.13 (observing that, barring a "replica detention facilit[y]," the success of any condition combination necessarily "hinge[s] on [the defendant's] good faith compliance").

Evidence rules do not apply in the detention hearing context. 18 U.S.C. § 3142(f). The key is simply evidentiary reliability and accuracy. *See, e.g.*, *United States v. Webb*, 149 F.3d 1185 (Table), No. 98-1291, 1998 WL 381686, at *1 (6th Cir. June 22, 1998). The Court properly considers a wide range of proof. The nature and quality of proof, though, impacts its probative value and weight in the detention calculus.

## II. ANALYSIS

### A. THOMPSON'S DANGER TO THE COMMUNITY

The BRA's § 3142(g) factors drive the Court's danger analysis. Specifically, the Court must consider the history and characteristics of the defendant, the nature and circumstances of the offense charged, the weight of the evidence against the person, and the nature and seriousness of the danger to any person or the community that would be posed by the person's release. *See* 18 U.S.C. § 3142(g).

#### 1. Thompson's History and Characteristics

Thompson is 36-year-old life-long resident of Richmond and Irvine, Kentucky. Prior to his arrest he lived in Irvine in his father's home with his father and his minor child. [Pretrial Services Report at 1]. His father and child remain in that home, and Thompson would return there if released. [Pretrial Services Report at 1]. Thompson also has siblings in the nearby area.

Thompson has not been employed for nearly a year and a half. [Pretrial Services Report at 2]. Thompson is in good physical health; however, he has a history of a suicide attempt resulting in hospitalization ten years ago. [Pretrial Services Report at 3]. Thompson does not have a history of drug or alcohol use disorders, though he reported occasional use of marijuana to manage stress. [Pretrial Services Report at 3].

Thompson had no criminal history other than traffic offenses and a misdemeanor shoplifting conviction in 2015 until 2025. [Pretrial Services Report at 3-8]. The mother of Thompson's child took out a domestic violence order against him in 2019. In general, however, Thompson lived a quiet and law-abiding life until last

year. In June 2025, that all changed. Thompson's fiancée, Reacheal Dawson, died suddenly, setting into motion the series of events that led to his spiraling behavior, a state conviction for terroristic threatening, and ultimately, indictment by a grand jury.[1] [Pretrial Services Report at 7-8].

**2. <u>The Nature and Circumstances of the Offense Charged</u>**

The United States presented the testimony of DEA Task Force Officer Timothy Graul to describe the nature and circumstances of the offense charged. His testimony closely matched the events described in the Affidavit accompanying the Complaint at DE 1, also sworn to by Graul.

On October 16, 2025, a federal grand jury indicted Brian Epperson for knowingly and intentionally distributing methamphetamine that resulted in the overdose death of Dawson. *United States v. Epperson*, EDKY no. 5:25-cr-00134-REW-MAS. Thompson was understandably grief-stricken by the sudden, unexpected loss of his partner. Upon learning that there was a specific individual who may be to blame, Thompson's grief turned to ire.

Over the following year, Thompson engaged in increasingly threatening behavior towards Epperson, law enforcement, and the judicial system. Below are some examples of his escalating conduct.

[1] Dawson's name is redacted as "R.D." in Epperson's indictment. The Court takes the privacy of victims with the utmost seriousness. However, in the year since Epperson's indictment, Dawson's identity has been widely reported in the news media, in unsealed hearings in this Court, and by Thompson in his many Internet postings. Thus, the Court will refer to Dawson by her name here as well.

- November 24, 2025: Thompson made threats in the courtroom immediately following Epperson's initial appearance in federal court. It was unclear whether the threats were directed towards Epperson or his counsel or both. Thompson had to be escorted out of the courthouse. [Recording at 7:30-8:02]. Thompson posted Facebook videos outside the courthouse in which he repeatedly threatened to kill Epperson. The video included statements that Thompson did not care how many United States Marshals were present, he would kill Epperson. [DE 18, Ex. 1].
- December 26, 2025: Thompson attempted to enter the room at the Red Roof Inn where Dawson died. When the clerk would not rent the room to him, Thompson broke into the room. The clerk called the police; the responding officer, Officer Gabbard, contacted Thompson. Thompson admitted to the conduct and told Gabbard he was "going to take his [Epperson's] fu****g head off[.]" [Pretrial Services Report at 8]. After his call, he posted additional threats on Facebook such as, "you want a war, I'm going to give you a war," followed by posting a photo of Gabbard's wife and baby.
- February 12, 2026: Thompson made a social media post with a shotgun in the background and the words "U can't stop me rember [*sic*] that." [DE 1-1 at Page ID# 6; Recording at 11:40-55].

- June 2, 2026: Law enforcement responded to complaints of a man on a bridge overpass holding a sign. When they arrived they found Thompson with a billboard in the back of his pickup truck. The billboard features Epperson's face and the words, "Brian epperson MURDERER. RAPIST. PREDATOR. RACIST. JUNKIE. WE WANT JUSTICE !!! DEATH PENALTY !!!" [DE 1-1 at Page ID# 7]. Law enforcement body worn camera footage captured Thompson stating, "I'll kill him, I'll slaughter him" in reference to Epperson. [DE 1-1 at Page ID# 7].
- June 25, 2026 (and other dates): Thompson attempted to schedule a personal visit with Epperson at the detention center. [DE 1-1 at Page ID# 9].
- September 15, 2026: Thompson posted a video on Facebook that included statements such as, "tell your officers to leave me the f*** alone because if you all don't leave me the f*** alone I'm gonna show you why I'm really a mother******." [DE 1-1 at Page ID# 12].
- October 3, 2026: Thompson posted a Facebook video in which he said that when he gets done killing Epperson, he would come after Detective Reed of the Winchester Police Department. [Recording at 11:20-35].

A grand jury indicted Thompson of obstruction of justice by threatening and harassing witnesses and parties from November 24, 2025, through October 3, 2026. [DE 10].

The nature and circumstances of this crime weigh in favor of danger-based detention on two fronts: first, Thompson has made repeated threats, on video, to physically injure or kill numerous people. He posed with firearms and stated that law enforcement will not be able to stop him. Second, his behavior and threats have harmed the integrity of the justice system itself, including continuation of Epperson's trial date.

**3. <u>The Weight of the Evidence of Dangerousness</u>**

In weighing the strength of the evidence, the district court may not modify or limit the defendant's presumption of innocence. 18 U.S.C. § 3142(g). "[T]he § 3142(g) analysis is concerned with a practical assessment of the defendant's dangerousness, rather than an adjudication of guilt for a particular offense." *United States v. Tolbert*, 2017 WL 6003075, at *5 (E.D. Tenn. Dec. 4, 2017) (citing *Stone*, 608 F.3d at 948).

This BRA factor is somewhat duplicative of the first and third because, in considering a defendant's overall dangerousness, the Court must consider the facts of the crime alleged as well as evidence that the defendant has been dangerous in the past, such as criminal history and a history of violent behavior.

The weight of Thompson's dangerousness is heavy when his behavior is considered in the aggregate, despite his limited criminal history. Thompson has repeatedly threatened to kill Epperson, specific law enforcement officers, and posted photos of one of their families with his threats. The Court cannot brush these threats off as merely "venting" because Thompson has proven access to firearms, and at least one Internet post suggests he will use a firearm to effectuate his threats. When Thompson was arrested on the federal offense, Graul observed an AR-15 rifle in

through the window of Thompson's truck near the driver's seat. [Recording at 12:00-06]. During the June 2026 interaction with law enforcement, officers noticed several boxes of ammunition in the center console of Thompson's vehicle. [DE 1-1 at Page ID# 8]. As discussed above, Thompson posted a photo of himself with a shotgun in February 12, 2026.

Thompson's dangerousness towards the judicial process has proven to be more than theoretical: his repeated threats towards Epperson's counsel and her family required her to withdraw from the case for her own safety and caused a several-month delay in the trial.

Taken together, the evidence of Thompson's dangerousness is strong.

**4. <u>The Nature and Seriousness of Danger Posed by Release</u>**

The Court must weigh "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4).

Thompson has had many opportunities to desist and has chosen instead to escalate. Thompson's December 2025 incident at the hotel where Dawson died and subsequent phone call with Gabbard resulted in a conviction for terroristic threatening. [Pretrial Services Report at 7]. He served 45 days in jail in early 2026 and was probated for two years. [Pretrial Services Report at 7]. Jailtime did not deter Thompson from his threats. Upon his release, as his posting intensified, Judge Wier (presiding over Epperson's case) appointed Thompson an attorney under the Criminal Justice Act to advise him of his victim's rights and protect his interests. *See In re: Kaylieb Thompson*, 5:25-mc-00002-REW. In July 2026, Judge Wier held at

hearing in that case in which Thompson, his counsel, and the United States were present. [5:25-mc-00002-REW, DE 5]. The purpose of the hearing was to address "the Court's concerns regarding Mr. Thompson's conduct and statements related to and impacting the Epperson Case." [5:25-mc-00002-REW, DE 5]. Judge Wier "summarized a series of federal crimes related to obstruction of justice and the associated penalties" before directing Thompson's counsel to "supply Mr. Thompson copies of 18 U.S.C. §§ 875, 1503, 1505, and 1512 and to discuss these restrictions with him[.]" [5:25-mc-00002-REW, DE 5]. Judge Wier acknowledged Thompson's stake in the Epperson case and reminded him he is required to act within the bounds of the law.

Still, Thompson did not stop. Jailtime did not stop Thompson. Multiple interactions with law enforcement did not stop Thompson. His attorney's warnings about federal criminal liability did not stop Thompson. Being hauled into federal court for a cautioning by Judge Wier did not stop Thompson. The Court has no reason to believe that any combination of conditions it could now impose will stop Thompson's year-long, well-documented threat campaign. The Court finds that Thompson, as repeatedly recorded in his own words, poses a serious risk of physical danger to Epperson, specific law enforcement officers, the United States Marshal Service, and attorneys involved if released.

**B. <u>NONAPPEARANCE RISK</u>**

Thompson has failed to appear in traffic court at least six times since 2010. [Pretrial Services Report at 3-8]. Although multiple failures to appear may be an aggravating factor when deciding whether to release a defendant, "[t]he Court can

see that it may be more likely that a defendant would forget about a court date for a traffic violation than for a felony charge[.]" *United States v. Munoz-Hernandez*, 2012 WL 5476892, at *11 (D. N.M., Nov. 5, 2012); see *United States v. Gibson*, 384 F. Supp. 3d 955, 964 (N.D. Ind. 2019) (finding that "multiple failures to appear" were aggravating). Thompson is a life-long Central Kentucky resident and all of his family lives nearby. Thompson has known that he was being investigated for his alleged obstruction activities and has not fled the jurisdiction. For these reasons, even with his history of failing to appear, the Court finds that the United States did not meet its burden of preponderant evidence that Thompson poses a risk of flight or nonappearance.

## III. CONCLUSION

On balance, the Court finds that the BRA demands pretrial detention in this case. As to the risk of nonappearance, the United States did not demonstrate by a preponderance of the evidence that Thompson is unlikely to appear as required, but did show by clear and convincing evidence that Thompson is an unmitigable danger to the community or others. Specifically, the Court finds that Thompson poses a danger to Brian Epperson, those involved in his case, and to the effective administration of justice of that matter.

Accordingly, **IT IS ORDERED** that the United States' oral motion for detention is **GRANTED** and directs that Thompson be detained pending resolution of the allegations against him.

The parties may appeal this Order under the terms of 18 U.S.C. § 3145(a).

Signed this the 29th of October, 2026.

MATTHEW A. STINNETT
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF KENTUCKY